## Appeal of VICTOR J. McQUADE.

Docket No. 6273.　　　Decided September 18, 1926.

> The evidence does not show that the good will of the taxpayer's business had a fair market value on March 1, 1913; hence, the taxpayer did not sustain any deductible loss from the fact that he could not continue his business after national prohibition became effective in 1919.

*Watson Washburn, Esq.*, for the petitioner.
*P. S. Crewe, Esq.*, for the Commissioner.

This is a proceeding for the redetermination of deficiencies in income tax for the years 1918 and 1919, in the aggregate amount of

$5,670.73. The principal point in issue is the disallowance of deductions from gross income of an amount for obsolescence of the good will of a wholesale liquor business.

FINDINGS OF FACT.

The taxpayer is a resident of Millbrook, N. Y. Prior to July 1, 1919, he was engaged in the business of wholesale liquor dealer, rectifier, and retail liquor dealer. The business was established at 11 Stone Street, New York City, in 1859, by the taxpayer's father, under the name of Peter McQuade. Peter McQuade died in 1898 and the business thereafter was carried on by his estate until 1901 under the same name. In 1901, the taxpayer, son of Peter McQuade, took over the entire business, good will, trade-marks, etc., under the terms of his father's will and carried it on under the same name of Peter McQuade. Owing to national prohibition he discontinued the business July 1, 1919. The principal brand sold was " Old Galaxy Whiskey," which brand was started in 1880 and owned exclusively by Peter McQuade. The following brands were also exclusively owned by Peter McQuade or the taxpayer:

" Westminster Club Dry Gin," " Round Tower Irish Whiskey," both acquired about 1884; " Glen Gordon Scotch Whiskey," " Black Watch Scotch Whiskey," adopted about 1912; and " Dixon Rye Whiskey," adopted in 1912.

In his income-tax return for 1918, the taxpayer deducted from gross income $121 spent for the purchase of tickets to entertainments. He had purchased these tickets from his customers who had in turn bought them from the promoters of certain entertainments. It was a recognized practice in the trade for the wholesale dealer to purchase these tickets from their customers or take them off their hands in order to keep in their good graces. The $121 thus spent for tickets was disallowed as a deduction from gross income by the Commissioner.

In his return for 1919, the taxpayer failed to include in gross income $6.51, which was the amount of tax paid at the source upon coupons of bonds of corporations, which corporations had issued the bonds with a tax-free covenant clause. The Commissioner amended the taxpayer's income-tax return for 1919 by adding to the gross and net income the $6.51 in question.

In connection with his business, it had been the taxpayer's practice for many years to invest considerable amounts of money in the purchase of warehouse receipts of whiskey in bond. The whiskey was purchased when the taxpayer had funds and when he thought the price was low. He often sold these certificates to his regular customers at considerable profit. In 1909 he had approximately $25,000

invested in these warehouse receipts and in 1913 the amount was approximately $70,000. On October 25, 1918, the taxpayer sold warehouse receipts for 50 barrels of Rossville whiskey, which had been purchased by him in 1911 at a price of 26 cents per gallon. In 1918 and 1919, the taxpayer sold warehouse certificates for 594 barrels of whiskey, which had been purchased by him prior to March 1, 1913. Approximately 5 per cent of this amount was sold in 1918, and 95 per cent in 1919. The taxpayer returned the profit from the sales of these warehouse receipts by deducting from the sale price the purchase price and the expense of carrying and selling the whiskey.

The exact computation by which the profit from the sale of this whiskey in 1918 and 1919 was determined is not in evidence by reason of the fact that the records of the business of the taxpayer are no longer in existence. The current market prices for whiskies were shown during the years 1910 to 1919, inclusive, by "Biles' Price Current," a publication that was issued at frequent intervals during this entire period. Wide use was made of the quotations for different liquors during this period by persons engaged in the buying and selling of liquors. The taxpayer purchased liquors according to these quotations. The whiskey which the taxpayer sold in 1918 and 1919 was purchased in 1911 and 1912. Biles' Price Current quoted the price of Rossville whiskey, the kind which the taxpayer purchased in 1911 and 1912 and sold in 1918 and 1919, at 26 cents a gallon at the time the whiskey was purchased in 1911, and at 31 cents a gallon at the time the whiskey was purchased in 1912. The same authority quoted the market price on January 1, 1913, the nearest quotation date to March 1, 1913, of the whiskey manufactured and purchased in 1911, and of that manufactured and purchased in 1912, at 34 cents and 36 cents a gallon, respectively.

The fair market price of the Rossville whiskey sold by the taxpayer in 1918 and 1919, and acquired prior to March 1, 1913, was 34 cents a gallon at that date. By reason of computing profits upon the sale of the warehouse receipts for this whiskey in 1918 and 1919, in the manner above described, the taxpayer included in his gross and net income $266.85 for 1918 and $1,574.07 for 1919, which amounts represented only the return to him of an appreciation in value of the certificates between the date of purchase and March 1, 1913.

The taxpayer's father died in 1898. His whiskey business was conducted by his estate until January 1, 1902. The taxpayer then took over the business, since his father had left to him the good will, trade-marks, and copyrights of the business which the taxpayer was to receive when he was 25 years of age.

The taxpayer gave to his mother and two sisters, who had an interest in the business, approximately $9,000 more than the market value of their shares in the tangible assets of the business.

The value of the assets of the business at the time the taxpayer acquired them in 1902 was approximately $40,000. In 1913 the value of the assets was in excess of $100,000.

In years prior to 1918, a considerable amount of the income of the taxpayer was attributable to dealings in whiskey warehouse receipts. Excluding from income the profits on the sale of the warehouse receipts and excluding from the capital of the business the amount of money invested in the warehouse receipts, the taxpayer's capital and net profit from his wholesale business for the years 1909 to 1917 were substantially as follows:

| Year | Capital | Net profit | Year | Capital | Net profit |
|---|---|---|---|---|---|
| 1909 | $48,714.32 | $7,188.02 | 1914 | $5,053.81 | $4,711.63 |
| 1910 | 39,688.66 | 7,263.04 | 1915 | 7,352.72 | 867.58 |
| 1911 | 40,431.94 | 3,913.27 | 1916 | 19,764.93 | 8,117.78 |
| 1912 | 21,674.89 | 3,767.53 | 1917 | 28,557.40 | 28,680.18 |
| 1913 | 20,142.92 | 221.47 | | | |

In his income-tax returns for 1918 and 1919, the taxpayer deducted from gross income $16,359.27 and $8,923.23, respectively, for obsolescence of the value of the good will of his liquor business. The Commissioner disallowed these deductions.

OPINION.

SMITH: 1. The taxpayer alleges error on the part of the Commissioner in disallowing the deduction from 1918 gross income of $121 spent for tickets of admission to entertainments which were sent to him by his customers to relieve them from a part of the burden which they were under in buying such tickets. The evidence shows that it was a common practice for wholesale liquor dealers to take from customers a certain number of tickets of admission which the customers felt compelled to take in order to retain the good will of the people of the community in which they lived. In the light of the evidence, we are of the opinion that the amount spent in the purchase of such tickets constituted an ordinary and necessary expense of the taxpayer in the conduct of his liquor business and as such was deductible from gross income.

2. The Commissioner amended the taxpayer's income-tax return for 1919 by adding $6.51 to both the gross income and the net income, representing the amount of income tax paid at the source by cor-

porations which had issued bonds with a tax-free covenant clause, the $6.51 representing the 2 per cent normal tax paid by the obligors upon coupons of bonds received and cashed by the taxpayer during the year 1919. The action of the Commissioner in adding the $6.51 to the taxpayer's gross and net income was in error. *Appeal of Mary Clark Kling*, 1 B. T. A. 1048; *Duffy* v. *Pitney*, 2 Fed. (2d) 230.

. 3. In making his returns of income for 1918 and 1919, the taxpayer computed profits upon the sale of warehouse receipts by deducting from the amount realized on the sale the cost thereof plus the carrying charges and sales commission. This was the method of computation used even in cases where the warehouse receipts had been purchased prior to March 1, 1913. Evidence has been introduced to show that certain whiskies purchased by the taxpayer in 1911 at 26 cents a gallon and in 1912 at 31 cents a gallon had a market value at March 1, 1913, of 34 cents a gallon. This increase in value realized upon the sale of the certificates in 1918 and 1919 did not constitute taxable income. Upon the method used by the taxpayer in computing his profit from the sales of warehouse certificates he included in his net income for 1918, $266.85 in excess of the taxable profit and in his return for 1919, $1,574.07 in excess of the taxable profit. In the redetermination of deficiencies in tax these errors should be corrected.

4. The last point relates to the right of the taxpayer to deduct from the gross income of 1918 and 1919 certain amounts for alleged obsolescence of good will of the taxpayer's liquor business, such claim being predicated upon the fact that the taxpayer was forced by prohibition legislation to discontinue his liquor business on June 30, 1919.

At the hearing, the taxpayer contended that his wholesale liquor business had some good will value at March 1, 1913, and he placed such value at $10,000 or $12,000. We think, however, that the evidence, which consists only of a statement of the earnings of the business for years prior to 1913, before any amount was deducted therefrom for compensation of the taxpayer or for return on his investment, does not prove that the business had a good will with cash value at March 1, 1913. The action of the Commissioner in disallowing the deductions of $16,359.27 and $8,923.23 from the gross income of 1918 and 1919 for obsolescence of the value of good will must therefore be sustained. .

> *Order of redetermination will be entered on 15 day's notice, under Rule 50.*